**Electronically Filed
Supreme Court
SCAP-18-0000632
19-JUN-2020
12:36 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Plaintiff-Appellee,

vs.

KOMA KEKOA TEXEIRA, JR.,
Defendant-Appellant,

and

CLAYTON KALANI KONA,
Defendant-Appellee.

SCAP-18-0000632

APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CAAP-18-0000632; CR. NO. 5PC161000398)

JUNE 19, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH NAKAYAMA, J., CONCURRING
AND DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY POLLACK, J.

The defendant in this case was convicted of murder in

the second degree.  At trial, he sought to introduce evidence

tending to show that a third-party committed the offense, but the trial court excluded the evidence. This appeal contends that the evidence was improperly excluded. The defendant also challenges the trial court's admission into evidence of a confession letter allegedly written by him because of its late disclosure to the defense, arguing that the State had control over the letter through a cooperating co-defendant nine months before the disclosure was made. Lastly, the defendant argues that DNA results showing his presence at the crime scene were improperly admitted at trial, as the State failed to show that the instruments used to conduct the DNA analyses were operated in compliance with the manufacturer's recommendations.

Upon review, we hold that the timing of the State's disclosure did not require the exclusion of the letter at trial. We also conclude that a sufficient foundation to admit the results of the DNA analyses was established to allow their admission into evidence. Finally, we hold that third-party culpability evidence was erroneously excluded, but the error was harmless beyond a reasonable doubt under the circumstances of this case.

## I.    BACKGROUND

### A.    Arrest and Pre-Trial Motions

On the night of October 31, 2016, Jon Togioka was fatally shot by a .22-caliber firearm near Hanapēpē on the

2

island of Kauaʻi. Kauaʻi Police Department (KPD) officers later arrested Koma Texeira Jr., Trish Flores, Brandon Pagala, Robert "Bobby" Dela Cruz, and Clayton Kona in connection with Togioka's death. Texeira was subsequently indicted for murder in the second degree in violation of Hawaiʻi Revised Statutes (HRS) § 707-701.5,[1] carrying or use of a firearm in commission of a separate felony in violation of HRS § 134-21,[2] and two counts of ownership of possession prohibited in violation of HRS § 134-7(b).[3] Kona was also charged in the same indictment with multiple offenses.[4] Prior to trial, Kona entered into a plea

---

[1] HRS § 707-701.5(1) (2014) provides as follows:

(1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

[2] HRS § 134-21 (2011) provides in relevant part as follows:

(a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not[.]

[3] HRS § 134-7 (2011) provides in relevant part as follows:

(b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

[4] Kona was charged as an accomplice to murder in the second degree in violation of HRS § 707-701.5, carrying or use of firearm in commission of separate felony in violation of HRS § 134-21, two counts of ownership or possession prohibited in violation of HRS § 134-7(b), and place to keep pistol or revolver in violation of HRS § 134-25.

agreement with the State in which he pleaded guilty only to hindering prosecution in the first degree in violation of HRS § 710-1029 and ownership or possession prohibited in violation of HRS § 134-7(b), in exchange for, inter alia, testifying at hearings, trials, re-trials following appeal, or other proceedings connected with Togioka's death.

### 1. Motion to Determine Voluntariness of Confession Letter Allegedly Written by Texeira

On February 13, 2018, the State filed a motion in the Circuit Court of the Fifth Circuit (circuit court) to determine the voluntariness of statements that Texeira allegedly wrote in a letter while in jail.[5]  In a declaration accompanying its motion, the prosecutor stated that Texeira wrote a letter saying he shot Togioka in self-defense and gave that letter to Kona.[6] Texeira filed a memorandum in opposition in which he argued, inter alia, that the State had violated Hawai'i Rules of Penal Procedure (HRPP) Rule 16 because the State had not produced the letter to the defense until February 9, 2018, which was one month before trial and 280 days after the State was informed of

---

[5]     The Honorable Judge Randal G.B. Valenciano presided over all proceedings in this case.

[6]     The letter stated that Togioka found a gun belonging to Texeira under the driver's seat of Texeira's car and began threatening him with the weapon.  A struggle ensued and resulted in Texeira fatally shooting Togioka.

its existence.[7]  Texeira maintained that on May 5, 2017, Kona gave a statement to KPD in which he stated that Texeira wrote

---

[7]  HRPP Rule 16 (2012) provides in pertinent part as follows:

(b)  Disclosure by the prosecution.

(1) Disclosure of Matters Within Prosecution's Possession.  The Prosecutor shall disclose to the defendant or the defendant's attorney the following material and information within the prosecutor's possession or control:

. . . .

(ii) any written or recorded statements and the substance of any oral statements made by the defendant, or made by a co-defendant if intended to be used in a joint trial, together with the names and last known addresses of persons who witnessed the making of such statements;

. . . .

(e)  Regulation of Discovery.

(1) Performance of Obligations.  Except for matters which are to be specifically designated in writing by defense counsel under this rule, the prosecution shall disclose all materials subject to disclosure pursuant to subsection (b)(1) of this rule to the defendant or the defendant's attorney within ten (10) calendar days following arraignment and plea of the defendant.  The parties may perform their obligations of disclosure in any manner mutually agreeable to the parties or by notifying the attorney for the other party that material and information, described in general terms, may be inspected, obtained, tested, copied or photographed at specified reasonable times and places.

(2) Continuing Duty to Disclose.  If subsequent to compliance with these rules or orders entered pursuant to these rules, a party discovers additional material or information which would have been subject to disclosure pursuant to this Rule 16, that party shall promptly disclose the additional material or information, and if the additional material or information is discovered during trial, the court shall also be notified.

(continued . . .)

two letters confessing to Togioka's murder while they were both in jail.  Subsequently, Kona's attorney discussed the contents of the letter purportedly written by Texeira in a May 19, 2017 interview with investigating officers.  Accordingly, Texeira argued that the State was aware of the letter and its nature on that date.

Additionally, Texeira contended that Kona was negotiating a plea deal prior to his interviews and thus was an agent of the State before May 19, 2017.  Because the letter was in the possession of a State agent as of May 19, 2017, Texeira argued, the State had an obligation to obtain the letter in a timely manner and disclose its contents to the defense. Alternatively, Texeira maintained that Kona became a state agent as soon as he entered into a plea deal on June 2, 2017, and thus the State had control over the letter at that time.  The State's failure to produce the letter until a month before trial was a violation of HRPP Rule 16, Texeira concluded, and therefore the State should be precluded from introducing the letter into evidence.

The State responded that it provided the transcript of Kona's interview to the defense on May 23, 2017, and provided

---

(. . . continued)

HRPP Rule 16 (2012) (some formatting omitted).

the second letter allegedly written by Texeira upon receiving it and thus did not violate HRPP Rule 16(b)(1)(ii).  The State further argued that Kona was not a government agent under its control.

On February 27, 2018, the circuit court heard arguments and testimony on the State's motion.  In addition to the arguments made in his memorandum in opposition, Texeira contended that he did not write the letter and that it was actually written by Kona.  Texeira maintained that the signature was suspect because it was at the top of the page and had hesitation marks that indicated it was someone trying to copy a signature.  Texeira also maintained that there was no way to determine the letter's authenticity or have fingerprint or handwriting analysis conducted because it was too close to trial to retain an expert, and that he should not be compelled to choose between a fair trial and his right to a speedy trial. The State responded that it provided the letter as soon as Kona's attorney provided it to the State, and that Kona would testify during the hearing as to the letter's authenticity.

Kona testified at the hearing that, after being arrested in connection with the death of Togioka, he had been placed in the same cell as Texeira in November 2016.  During this time, Texeira wrote a letter confessing to the murder and stating that Kona had nothing to do with it.  Kona said that he

personally saw Texeira write and mail the letter to Texeira's attorney. According to Kona, this letter was apparently not useful for Kona's defense, so Texeira wrote a second letter. Kona stated that he also saw Texeira write the second letter and that he did not force him to write the letter. Texeira gave him a copy of the second letter, which Kona gave to his own attorney. When shown a copy of the second letter, Kona said that it was a true and accurate copy of the letter he saw Texeira write. He believed the second letter was written about a month after he had been arrested. Kona further testified that neither the police nor the prosecution asked him to get Texeira to confess to Togioka's murder and he told the State about the letter prior to signing a plea deal on June 2, 2017.

Following the hearing, the circuit court issued an order granting the State's motion to determine voluntariness. The court found that in December 2016, Texeira voluntarily wrote a second letter, witnessed but not directed by Kona, after discovering that his first letter would not help Kona. The court found Kona was not an agent of the State when Texeira gave him the second letter and was not directed to obtain a confession from Texeira. The court thus permitted the second

letter to be admitted into evidence.[8]  The court did not rule upon Texeira's contention that the second letter had been untimely disclosed.

### 2.    Texeira's Motion in Limine to Exclude DNA Evidence

Prior to trial, Texeira filed a motion in limine seeking the exclusion of DNA evidence at trial based on the unreliability of the procedures that the State's DNA expert had used to obtain the DNA results.  At the hearing, the State called Emily Jeskie, an employee of Sorenson Forensics (Sorenson), a private DNA testing laboratory that had conducted DNA tests on buccal swabs and cigarette butts recovered at the crime scene.[9]  Jeskie testified that each Sorenson lab employee is proficiency tested every six months by an outside agency and Sorenson is accredited by the American Society of Crime Laboratory Directors International (ASCLD) accreditation board. Jeskie explained that the accreditation process entails ASCLD auditing the laboratory, ensuring that the tests are performed to standard, and verifying that the employees are competent to perform the tests.  The competency testing is conducted by

---

[8]     The court redacted two lines in the letter, starting with the sentence "I lied to detectives."  Further, the court permitted the State to reference that the first letter was written, but it excluded the contents of any communications between Texeira and his attorney.

[9]     Jeskie, who testified via videoconference, stated that she had a bachelor of science in molecular biology from Brigham Young University, had participated in a six-month training program in forensic DNA casework, and had testified in approximately 48 cases as an expert in DNA testing.

Collaborative Testing Services (CTS). Sorenson has never lost its accreditation, been placed on probation, or had its accreditation withheld or suspended, Jeskie testified.

Jeskie further explained that each test is subject to a "control," which confirms that the testing process worked correctly and did not have contamination. Sorenson has positive controls used in each step of its testing process to indicate what the results should be and if the control "doesn't type correctly," then it shows there was a problem in the testing.

A second hearing on Texeira's motion was conducted to allow the State to supplement the record regarding the reliability of the DNA evidence.[10] Jeskie testified that every machine used by Sorenson is required to be "validated" under the Federal Bureau of Investigation's (FBI) quality assurance standards. Validation entails a study conducted to ensure that the machine is reliable and its results are reproducible. The validation process shows whether each test was done correctly and if there was contamination. Validation is done at each step of the testing to ensure that the control was passed. The FBI quality assurance standards require Sorenson to validate its equipment and train its employees using certain methods. Jeskie explained that all employees are required to complete a standard

_____

[10] All of the witnesses at the second hearing testified via videoconference.

training program on the equipment and that the training program and validation method Sorenson uses is reviewed as part of the ASCLD accreditation process.

Each machine and piece of equipment is subject to controls to ensure they are working properly and are regularly maintained, Jeskie testified. Logs are kept of the maintenance and if a machine is not in working order, it is taken out of commission. The State introduced into evidence a certificate of authenticity and a maintenance record for the machines used to test the DNA evidence to show that they were in proper working order at the time the analyses of the evidence in this case were conducted. The maintenance record was a 48-page log that detailed equipment maintenance on several machines dating as far back as June 24, 2011, and through February 2018. The log recorded daily, weekly, monthly, and annual maintenance, performance checks, error corrections, adjustments, preventative maintenance, calibrations, and time periods when the machines were removed from and placed back into service.

The State called several other Sorenson employees that were involved in analyzing the DNA evidence in this case. All of the witnesses testified that the machines utilized to conduct the DNA tests were in working order and that they conducted the testing in compliance with Sorenson's standard training program and operating procedures. Several Sorenson employees testified

that Sorenson did not itself manufacture any of the machines they used and that they did not know the manufacturer's identity. The witnesses also testified that the machines were not manufactured by ASCLD, CTS, or the FBI.

Texeira maintained that the DNA evidence should not be admitted at trial because the State could not lay a proper foundation establishing that the equipment used to conduct the analyses produced accurate results, unless the user was trained to operate it in the manner recommended by the machine's manufacturer. Since the State had not adduced any evidence that the machines Sorenson used to analyze the DNA evidence were operated in compliance with the manufacturer's recommendations, Texeira contended that none of the results were proven to be reliable.

In its written order denying the motion, the circuit court found that the Sorenson employees used valid and reliable techniques to obtain DNA profiles, the instruments were in proper working order, and the employees were trained to use, and did use, accepted procedures. The court recognized Jeskie as an expert in DNA testing and profiling and additionally found that the use of DNA evidence to generate a DNA profile and identify a person is reliable science, the DNA test results were relevant to the issue of the identity of the perpetrator, and the results would assist the trier of fact.

## B.    Trial Proceedings

Leana Contrades, Kona's girlfriend and the mother of his daughter, testified that at the time of the events in question she was living at Kona's house along with five other people, including Texeira.  Contrades stated that at about 9:00 a.m. on October 30, 2016, she went to Wailua with Kona and Roberta Bactad, a relative of Kona's, and they returned to their home sometime that evening.  The next day, October 31, Kona slept until about 6:00 p.m.  Contrades testified that Texeira attempted to speak to Kona several times that day but was unable to do so while he was sleeping.  When Kona woke up, she told him that Togioka had stolen a cell phone from Kona's house.  Kona was upset by this, and he asked her to "find out where [Togioka was] and tell him to come over."  Contrades called Texeira on Kona's cell phone and told him that Kona wanted Togioka to come to their house and "settle it."

Togioka arrived at the house shortly after, and Contrades heard Kona say, "Where's the phone?"  She saw Kona "have [Togioka] against the wall, chest against the wall and his hand behind his back," while Togioka repeatedly said that he did not steal the phone.  Contrades then went into her bedroom, and Kona came in upset and angry.  According to Contrades, Texeira entered the room and asked Kona, "So what do you want to do about it?" and Kona said, "just get him out of here."  After

this exchange, Kona, Contrades, and their infant daughter went to a Halloween party around 7:00 p.m.[11] They stayed at the party until around 10:00 p.m., dropped Kona's cousin off in Kekaha, and then went home.[12] Kona left for 20 minutes to return Bactad's car, which they had borrowed.

Contrades stated that Kona kept a firearm in the house. Specifically, she saw one gun and three different types of bullets in the house prior to October 31, 2016. Also, a couple of days after October 31, Trish Flores and Brandon Pagala came to Kona's house around 3:00 a.m. Contrades described Flores as "paranoid" and stated that she "didn't seem herself."

Kapena Wilson, a KPD police officer who investigated Togioka's murder, testified on behalf of the State. During cross-examination, defense counsel asked, "do you know if Trish Flores was arrested in connection with this case?" The State objected on the grounds of "legitimate tendency," arguing that Texeira was "starting to put it on somebody else without any

---

[11] Dina Akutagawa, who was living with Kona's brother during October and November 2016, testified that Kona was at the Halloween party from 8:00 to 10:00 p.m. At the beginning of the Halloween party, Akutagawa stated, Kona had a scrape on his middle right hand knuckle which Kona said came from punching Togioka.

[12] Bactad testified that on October 31, 2016, Kona borrowed her car around 7:00 p.m. and returned it around 10:30 p.m. Kona stayed at her house until 11:00 or 11:30 p.m. and then went straight home. Texeira came to her house while Kona was there but left after saying "he had something to do." Bactad testified that it would only take about ten minutes to walk between her house and Kona's, and that she knew Kona went straight home because she talked to Contrades that evening.

14

connection to this." Defense counsel responded that Flores "gave a fake motive and was arrested with .22-caliber bullets," which were the same caliber as the bullets that killed Togioka, and Contrades had testified that Flores came over to Kona's house soon after the killing and was acting strangely. The court sustained the objection but added that if Flores became a suspect, Texeira could recall Wilson.

Brandon Pagala was also called as a witness by the State. During cross-examination, defense counsel attempted to ask Pagala about his arrest on November 2, 2016, but the State objected, arguing "there's been no established legitimate tendency . . . . [h]e's getting into the area of [Pagala] having a firearm and bullets." Defense counsel responded, "we're not saying he shot him. We're saying he's part of a group of people covering up who shot him. And the fact that they had .22-caliber bullets, which is the caliber used in this case, the day after the body was found is relevant to show that." The State replied, "it's already an inference that [] he's been arrested for something. But we don't need to get into what the reasons why he was arrested is." The court ruled that Texeira would be allowed to show "that [Pagala] was arrested," but the inquiry would have to end there.

Pagala testified that he had been friends with Kona for over 18 years but did not hang out with him. He was friends

with Flores, Pagala explained, and hung out with her regularly. Defense counsel attempted to ask Pagala if "some people fear[ed]" Flores or if she "can get violent," but the court sustained the State's objection. Counsel argued that he should be allowed to ask these questions:

> Well, that all goes to the fact that these people do fear certain people, and it's not my client, and that those people were involved with having .22 caliber bullets at the time, had a problem with Jon Togioka, and all associated with Clayton Kona, who was the one who punched Jon Togioka before his death, and that if they're -- so who they blame is going to be away from their group and blame the new guy, the smallest guy, the -- or the youngest guy anyway. And that there are certain people who are feared -- my client's not one of them -- and that that's why they would do all of this.

The court ruled that defense counsel could ask Pagala if he was involved in the conspiracy, and if Pagala admitted involvement, then counsel could ask further questions.[13]

Dela Cruz testified that in October and November 2016, he was actively using crystal methamphetamine. On October 31, 2016, Texeira asked Dela Cruz to ride with him to "go see [] Togioka." Texeira told him to bring a bat, but he did not do so. Dela Cruz rode in the front passenger side of Texeira's vehicle, and when they found Togioka he got into the backseat. The three smoked methamphetamine and cigarettes before going to Kona's house. When they arrived, Texeira and Togioka went in, but he did not after Kona told him not to.

---

[13] Defense counsel commented that no one would admit they were in a conspiracy, and counsel did not ask Pagala if he was in one.

Texeira then drove the three of them to Burns Field, an area near the airport in Hanapēpē. Togioka said he wanted to go home, but Dela Cruz encouraged him to stay with them and "just cruise." Dela Cruz testified that around 8 or 9 p.m., Texeira and Togioka got out of the car; he stayed in because "[Texeira] wanted to talk to [Togioka] only." Dela Cruz turned the stereo up loudly because he didn't want to listen to the conversation, but he was still able to hear Togioka say, "[I] never do anything." He then heard a gunshot coming from in front of the vehicle towards the driver's side, followed by two or three more. Immediately after the first gunshot, Dela Cruz heard Togioka yell "don't shoot me" and "you shot me." He saw Togioka was face down on the ground, 15 to 20 feet in front of the car. Dela Cruz admitted that he did not tell the police or grand jury about Togioka's statements prior to trial. He stated that he did not shoot Togioka nor did he see Texeira shoot Togioka.

Dela Cruz testified that he did not see Texeira or Togioka with a gun when they exited the vehicle, but when Texeira came back to the car he placed a "revolver with a long barrel" on the driver side floor. They then drove away, and Texeira told Dela Cruz that he shot Togioka because "he had to." Dela Cruz stated that he did not know Texeira was going to shoot

Togioka and that he didn't go to the police because he was scared.

Kona testified that Texeira was living with him on October 29, 2016, when Togioka came to his house. Togioka got into a fight with a housemate that Kona broke up, but he later learned that Togioka re-incited the fight away from Kona's house. This upset Kona because he thought he had settled everything, so he asked Texeira to bring Togioka back to the house. When asking him to do this, Kona admitted, he "probably" said something along the lines of "I like shoot this fucker" to Texeira. Kona testified that he told Texeira to bring Togioka to the river behind his house. As he went to meet Texeira, he received a text message from him stating, "I wouldn't shoot just yet. He get interesting things to say." Kona testified that he had a .22-caliber revolver belonging to Texeira on him at the time, which he shot into the air. The shot scared Togioka, but they settled their problems and went fishing together. Kona stated that he put the gun on a shelf at his house.

On October 31, 2016, Kona woke up to learn that Togioka was accused of taking a housemate's phone. He doubted that Togioka had the phone because they had been fishing together all night. He asked Contrades to contact Texeira in order for him to bring Togioka back to "clear up this phone situation." Texeira brought Togioka to the house and Togioka

attempted to lie and say the phone was his, so Kona punched and wrestled with him. Contrades broke up the fight, Kona stated, and Texeira made Togioka leave the house. Texeira then asked him "if I seen his gun or if I knew where his gun was," and he told Texeira where to find it. Later that evening at the Halloween party, Texeira called Kona and asked what he wanted done about Togioka. Kona testified that he said, "I don't care," and hung up without giving any directions. Later, but still at the Halloween party, he received a text message from Texeira saying, "Aw pau," which meant "done." After the party, he returned the car to Bactad's house and then went home with Texeira, who arrived at Bactad's house around the same time. Texeira "started to say something about the gun was--misfired at first," Kona explained, but he cut Texeira off. Kona stated that the revolver tends to "jam from time to time."

Kona testified that he first learned that Togioka had been killed on November 1, 2016. That day, Texeira told Kona that he hid the gun under the hood of a white Ford truck on Kona's property. Kona retrieved the gun and hid it in a pipe down by the river. Kona said that he didn't initially go to the police because he was afraid of Texeira. He was questioned by the police on November 3, 2016, and denied any involvement with Togioka's death. Kona admitted that he lied to the officers; specifically he told them that he hadn't seen Togioka on October

31, 2016, that he did not hit Togioka on October 31, 2016, and that he did not own or possess a firearm and one was not on his property. On November 4, 2016, after he had been arrested and charged as an accomplice to the murder charge, Kona showed the police where the firearm was hidden on his property. Kona stated that he subsequently signed a plea agreement in which he pled guilty to hindering prosecution in the first degree and ownership or possession prohibited of a firearm. Kona admitted that at the time he made the plea agreement he was facing a possible life sentence, but the sentence was reduced to a maximum of ten years; it ultimately could be five years or even probation based on his cooperation with the State.

While he was incarcerated at Kaua'i Community Correctional Center (KCCC) with Texeira, Pagala, and two other men, Kona stated that Texeira confessed to killing Togioka. Texeira said that he, Togioka, and Dela Cruz were looking to buy drugs but were unsuccessful. Texeira stated that he had asked Togioka about the phone, but Togioka denied having it. Kona testified that Texeira said that he then shot at Togioka but the gun misfired, so Texeira said he was joking. Texeira told him that he pulled the trigger again, shooting Togioka in the arm and causing him to collapse to the ground. Texeira said that Togioka yelled to Dela Cruz for help but Dela Cruz stayed in the

car, and that he shot Togioka in the head.  According to Kona, Texeira told this story several times in a bragging manner.

Kona also testified that Texeira wrote two letters containing these details, the first of which Texeira sent to his attorney to help Kona in his case.  Texeira was neither forced nor told to write the letters, Kona said.  Texeira gave him the second letter, which Kona passed on to his own attorney.  Texeira knew this letter would be given to his attorney, Kona testified, and Texeira wrote the letter "because he felt bad that I was in there for something I didn't even do."  Kona stated that Texeira made the statements about killing Togioka and wrote the letters before he had a cooperation agreement with the prosecution.

During his direct examination, Pagala testified about his confinement in the same cellblock as Texeira and Kona at KCCC.  While they were in jail, Texeira casually told him and Kona several times what occurred.  According to Pagala, Texeira told him that he attempted to shoot Togioka but that the gun would not fire.  Texeira then told him that he shot Togioka in the hand and head.  After being shot in the hand, Togioka asked Dela Cruz, who was in the car, for help.  Pagala did not remember when Texeira made these statements, but he told the police about them several months after they were made.  He never discussed the killing with Kona, but he did see Texeira write

letters about the case while in jail.  Pagala said that he couldn't remember what he and Kona talked about when they were in jail and only remembered some of the things Texeira said to him.  He stated that he does not have memory problems, but he does forget things and did not remember saying some of the things he said in his police interview.

Ronnie Schmidt, a friend of Kona, testified that he was working on Kona's house on October 31, 2016, around 4 or 5 p.m.  He was working in an area behind the house where he found a .22-caliber revolver on a shelf.  He played with the gun before wrapping it in a cloth and putting it down on a table near his work crew.  Texeira came out of Kona's house looking for the weapon, so he gave it to him.  Texeira then got into a car with Togioka and Dela Cruz, Schmidt stated, and the three drove off.[14]

FBI Special Agent Edwin Nam testified as an expert in the field of historical cell site analysis.  He testified about data collection techniques used to determine where a cell phone was at various points in time, including cell tower coverage and call detail records.  Nam testified that he received Verizon

---

[14]    Flores was granted transactional immunity and was initially expected to testify.  During the course of trial the State filed an ex parte motion to withdraw Flores' immunity, which the court granted.  Flores' attorney then informed the court that she would invoke her right against self-incrimination if she were called to testify.

call detail records for phones belonging to Texeira and Kona and text messages from Texeira's phone number. The records, which contained the contents of certain text messages, indicated that a text message from Texeira's phone was sent at 6:19 p.m. on October 31, 2016, which said "[g]rab a bat." There was also a message sent from Texeira's phone to Kona's phone at 8:22 p.m., which said, "all pau."[15] KPD provided Nam with the latitude and longitude of where Togioka's body was recovered and the address of Kona's house. Based on phone calls made by Kona's phone between 7:55 and 9:10 p.m. on October 31, 2016, Kona's phone could not have been near Togioka's body because it was near Kona's house. Nam further testified that Texeira's phone was in the same area as Togioka's body at 7:54 p.m., and that it remained there for at least 16 to 18 minutes and potentially up to 30 minutes. By 8:55 p.m., Texeira's phone was moving in a way consistent with it leaving Kekaha and going towards Waimea. Between 8:59 and 10:29 p.m., Texeira's phone was in a position consistent with it being at Kona's residence based on its interaction with cell phone towers.

Stephanie Regan, a crime scene and laboratory supervisor for the KPD, testified that she was the KPD ParaDNA

---

[15] Nam's testimony regarding this message is consistent with Kona's testimony as to a message he received from Texeira that evening with the exception that Kona stated the message was spelled, "Aw pau."

administrator, a position in which she conducts presumptive screening of DNA evidence that gives a partial, but not full, DNA profile.[16]  In addition to analyzing DNA evidence, Regan stated that she conducts digital forensics for KPD, using the Cellebrite Universal Forensic Extraction Device (UFED) to extract digital evidence from cell phones, tablets, or external drives.

Regan testified that she used Cellebrite UFED on a blue colored Verizon Samsung Galaxy phone, identified as Texeira's phone.  She was able to extract text messages, including the contacts to whom the messages were sent and the times of sending.  On October 30, 2016, at 3:16 a.m., Texeira sent, and later deleted, a text message to Kona's phone stating, "I get Jon".  This was followed by a further deleted message from Texeira, "I bringing him," and a response from Kona's phone stating, "To the back.  Crispy."  Texeira sent, and deleted, a text message to Kona at 3:30 a.m., "I wouldn't shoot just yet. He get interesting things to say."  On October 31, 2016, at 6:06 p.m., Texeira received a text message from a contact identified in the phone as "Lei," asking, "You know where [Togioka] stay?"

---

[16]    Regan testified that she has a bachelor's degree in human development and biology from Harvard University, was pursuing a master's degree in digital forensics from the University of Central Florida, was a certified crime scene investigator, and had been with the KPD for approximately three and a half years.  The court recognized Regan as an expert in the field of digital forensics.

Regan stated that on November 2, 2016, she investigated the scene of Togioka's death. She observed several cigarettes next to his body. In order to perform DNA testing, these cigarettes, along with buccal swabs from Texeira, Kona, Pagala, and Flores were collected. Regan personally conducted ParaDNA tests on several of these cigarettes before sending the cigarettes, Texeira and Kona's buccal swabs, and a blood sample from Togioka to Sorenson.

Regan stated that on November 4, 2016, she recovered a .22-caliber revolver hidden in a drainage pipe by the river behind Kona's house. Six rounds, five of which were spent, were recovered from the revolver. KPD was not able to test the revolver to determine if it was the weapon used to kill Togioka. Regan stated that she also observed an injury on Kona's middle right hand knuckle, which appeared to be a few days old as of November 4, 2016.

Jeskie, the Sorenson employee who testified at the pretrial HRE Rule 104 hearing, testified as an expert in DNA forensic testing.[17] She analyzed the cigarette butt found near Togioka's calf against a DNA reference from Texeira. The cigarette butt had a single source of DNA, which was matched to

---

[17]    Defense counsel objected to Jeskie's expert testimony at trial, incorporating by reference the grounds asserted in Texeira's motion in limine to exclude DNA evidence.

Texeira and no other individuals. Jeskie testified that the odds that the DNA would come from someone other than Texeira was one in 24.1 octillion for Caucasians, one in 4.16 octillion for African-Americans, and one in 1.63 octillion for Hispanics.[18] Even if Texeira was not Caucasian, African, or Hispanic, the results would not change drastically. Jeskie stated that she did not receive DNA samples from Dela Cruz or Flores. DNA tests were also conducted on swabs taken from the .22-caliber revolver. The grip area DNA result was inconclusive, Jeskie stated, and the barrel end had no DNA. Jeskie did not analyze the trigger, hammer area, ejector rod, or cylinder area of the revolver.

Detective (Det.) Christopher Calio, an officer with KPD, testified that no bullet casings were found at the location of Togioka's body. This was consistent with either a weapon that did not eject its casings, such as a revolver, or with someone picking up the casings. He recovered a firearm with the help of Kona, but attempts to test fire it were unsuccessful. Det. Calio also testified that on November 7, 2016, he assisted Texeira with filling out some paperwork. The detective identified a document as one of the forms that Texeira filled

---

[18]     Jeskie explained that an octillion is "a one with 27 zeros after it."

out and signed at that time. Det. Calio knew that Texeira had signed the document because he personally saw him do so.

Det. Eric Caspillo, an officer with the KPD, testified that he went over some paperwork with Texeira shortly after Texeira was arrested and observed him sign multiple forms. Det. Caspillo identified two exhibits as copies of those forms and stated that he recognized Texeira's signature on the exhibits. KPD Lieutenant (Lt.) Darren Rose also testified that he observed Texeira sign and write on several documents. When asked to compare Texeira's signature on those documents with the one on the second confession letter, Lt. Rose testified that they were the same signature.

Lt. Christian Jenkins of the KPD testified that he interviewed Texeira on November 4, 2016, at the police substation in Waimea. A recording of the interview was played before the jury. In the interview, Texeira stated that on October 31, 2016, he went to Kona's house in the morning, spent the day with his grandfather, and stopped at Kona's house again around 9:00 or 10:00 p.m. He left because no one was home, and he went to pick up his brother at "Shark's Bay." Texeira estimated that he picked his brother up between 9:00 and 10:00 p.m. He took his brother back to Shark's Bay on November 1, 2016, around 8:00 a.m., because his brother had left his car there. Texeira stated that he had not been near the Burns

Field-side of Shark's Bay, but that instead he was on the other side of the bay near the tennis courts.

Dr. Lindsey Harle, a forensic pathologist, conducted the autopsy on Togioka. She observed a gunshot entry wound on Togioka's head and on his right forearm. The shooter was facing Togioka when he shot him in the forearm, but the right forearm wound was not fatal. Based on the nature of the forearm and head wounds, Dr. Harle explained, she was unable to determine how far away the gun had been from Togioka's forearm or head when he was shot. It could have been a distant shot, or it could have been a close shot that passed through an intervening material like a hat or a T-shirt. In addition to the gunshot wounds, Togioka had multiple injuries across his body indicating blunt force trauma and falling onto rocks. Dr. Harle stated that the condition of Togioka's body was consistent with his having died between 8:00 and 9:00 p.m. on October 31, 2016.

At the end of the State's case-in-chief, Texeira moved for a judgment of acquittal, which the court denied. Texeira also filed a Trial Memorandum Regarding Witness Trish Flores in which he elucidated the evidence he would present to show there was a legitimate tendency in the evidence to show that Flores killed Togioka and was intimidating the other witnesses into testifying falsely. Texeira cited statements that an individual named Shannon Breen made to KPD officers, Kona's statements to

the police during interviews on November 3 and November 6, 2016, Flores' statements to the police during interviews on November 2 and November 5, 2016, certain evidence obtained by KPD, and Flores' actions around the time of the murder.

Texeira argued that, during a police interview, Breen stated that she saw Flores and Pagala in Pagala's residence on October 31, 2016, around 3:00 a.m., and they were in possession of a box of .22-caliber bullets. Breen heard Flores ask Pagala if he had the bullets she "gave him," and Pagala said that he did. Breen further stated that she had heard that Togioka owed Flores money, and that she saw Flores and Pagala watching a video on Flores' phone in which Flores had tied up a man who owed her money and was shocking him for up to ten minutes at a time with an electroshock weapon.

Texeira also proffered a statement Flores gave to the police on November 2, 2016, in which she stated that Togioka had assaulted a friend of hers on October 29, 2016. Flores told the police that she learned on October 30 that Togioka had claimed to be in a sexual relationship with her at some time in the past and she had confronted him about his claims that day. Additionally, Flores acknowledged she and Pagala had a .22-caliber rifle in her car on either the night of October 31 or November 1, but when pressed for details she claimed that she could not recall which day it was and could not recall her

29

whereabouts on the evening of October 31.[19]  Texeira also pointed to the facts that Flores and Pagala were in possession of .22-caliber bullets when they were arrested two days after Togioka's murder; KPD had observed Pagala arrive at a residence with Flores on the morning of November 2 and Pagala had entered the residence carrying a small caliber rifle; and Flores was a person of interest in KPD's investigation of Togioka's death. Texeira asserted that Flores gave a false alibi to the police about her whereabouts on the evening of October 31, 2016, and her whereabouts remained unverified.

---

[19]  Texeira pointed to the following exchange in particular:

DETECTIVE: You have a rifle.  What caliber is it?  Okay. Let me say it again.  Jon's dead.

FLORES: Yeah

DETECTIVE: Now, before you say anything to me again, think about it.  Okay?  I want you to think about it.  Why is Detective Calio asking you this?  Why?  Okay.  I want you to think hard because, right now, you're – you're kind of cloudy on Monday evening, Halloween.  I want you to think about it, yeah.  So do you need me to step out so you can think?

FLORES: No.

DETECTIVE: Okay.  Now, I just want to say to you again, Jon Togioka is dead, you have a .22-caliber rifle in your car.

FLORES: I don't know what for say.  I don't know.  I don't know what for say.

DETECTIVE: Where were you the evening that Jon died?

After repeatedly saying she could not recall her whereabouts that evening, Flores ultimately stated that she and Pagala were alone at her house.

Texeira further noted that Kona or someone else would call or go see Flores after "almost every incident with [] Togioka."  Texeira cited numerous incidents, including one Kona described in a police interview on November 6, 2016, in which Kona told the police that he called Flores immediately after shooting at Togioka on October 29, 2016, and Flores said something about wanting to shoot Togioka at that time.[20] Finally, Texeira pointed to the fact that Flores had come to Kona's house the night after Togioka's death and was acting paranoid.  These facts, Texeira contended, established a legitimate tendency that Flores had killed Togioka, and he should therefore be permitted to argue at trial that Flores was the culprit.

Texeira moved to introduce at trial the proffered evidence outlined in the memorandum.  The State opposed the introduction, maintaining that since the evidence did not indicate Flores could have committed the crime, such evidence was irrelevant.  The court denied Texeira's motion, finding that there could be evidence of motive for Flores, but there was no

---

[20]  After telling the interviewing officers that he called Flores immediately after firing the shot, the officers asked Kona what exactly she said to him on the phone and specifically whether she said anything about wanting to shoot Togioka.  Kona responded that she "did say something there" but could not recall the exact words, and he suggested that she was not serious.

direct connection. The court thus excluded the evidence Texeira proffered.

Texeira recalled Det. Caspillo in his case-in-chief. Det. Caspillo testified that there were no shell casings around the body, which meant that the gun used could have been a revolver or a rifle. The shooter also could have used a semiautomatic pistol and then picked up the shells. Det. Caspillo further testified that on November 3, 2016, he took Kona's statement, and Kona denied having a gun. On November 4, 2016, Det. Caspillo executed a search warrant on Kona's residence where he discovered one round of .22-caliber ammunition, one .250 SAV caliber round, one 7-millimeter live ammunition round, gun cleaning solution, a handgun holster, over seven cell phones, three of which were associated with Kona, and SIM cards in an interior bedroom. The defense rested after Det. Caspillo's testimony. Texeira moved for a judgment of acquittal, which the court denied.

The jury found Texeira guilty of murder in the second degree, carrying or use of firearm in the commission of a separate felony, and ownership or possession prohibited.[21] Texeira was sentenced to life imprisonment with the possibility

---

[21] The parties stipulated that Texeira was prohibited from owning, possessing, or controlling any firearms or ammunition, and that Texeira knew of this prohibition.

of parole with a mandatory minimum of 15 years in count one, 20 years imprisonment in count two, and an extended term of ten years in count three, all terms to run concurrently.

### C.    Appellate Proceedings

Texeira appealed the July 25, 2018 Judgment and Sentence of Conviction to the Intermediate Court of Appeals (ICA).  On August 26, 2019, Texeira filed an application for transfer of the appeal to this court, which this court granted.

Texeira raises three points of error on appeal.  He argues that the circuit court erred by (1) admitting the confession letter allegedly written by Texeira into evidence; (2) admitting DNA evidence that allegedly placed Texeira at the crime scene; and (3) excluding evidence that a third-party, Flores, killed Togioka.

### II.    STANDARDS OF REVIEW

### A.  Questions of Law

Questions of law are reviewable de novo, under the right/wrong standard.  Ass'n of Apt. Owners of Royal Aloha v. Certified Mgmt., Inc., 139 Hawai'i 229, 233, 386 P.3d 866, 870 (2016) (citing Ditto v. McCurdy, 90 Hawai'i 345, 351, 978 P.2d 783, 789 (1999)).

### B.    Findings of Fact

We review a circuit court's findings of fact under a "clearly erroneous standard."  State v. Rodrigues, 145 Hawai'i

487, 494, 454 P.3d 428, 435 (2019). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." State v. Kaneaiakala, 145 Hawai'i 231, 240, 450 P.3d 761, 770 (2019).

## III.   DISCUSSION

### A.  The Trial Court Did Not Abuse Its Discretion in Admitting the Second Confession Letter at Trial.

Under HRPP Rule 16, the State must disclose to the defendant or defendant's attorney "any written or recorded statements . . . made by the defendant" that the State has in its "possession or control."  HRPP Rule 16(b)(1)(ii).  Texeira contends that the State violated its obligations under HRPP Rule 16 by failing to timely produce the second confession letter to the defense.  He maintains the State had possession or control of the letter as early as May 19, 2017, when it became aware of the letter's existence.  Alternatively, Texeira argues that Kona was an agent of the State after entering into a plea agreement on June 2, 2017, and thus the State had control over Kona and any documents in Kona's possession, including the second confession letter.  Under either alternative, contends Texeira, the fact that the second letter was not turned over to the

34

defense until ten months later, which was one month before trial, meant that the State had not met its HRPP Rule 16 obligations. Texeira notes that the circuit court did not expressly rule on his contention that the letter had not been timely disclosed to the defense pursuant to HRPP Rule 16.

This court discussed the prosecution's disclosure obligations under HRPP Rule 16 in State v. Moriwaki, 71 Haw. 347, 354, 791 P.2d 392, 396 (1990). In Moriwaki, the defendant was charged with murder for fatally stabbing his sister's boyfriend. Id. at 349, 791 P.2d at 393-94. At trial, the defendant argued that he acted in self-defense after the boyfriend initiated an altercation with him. Id. at 350-51, 791 P.2d at 394-95. In rebuttal, the prosecution adduced evidence of the boyfriend's peaceful character. Id. The jury found the defendant guilty of manslaughter. Id. at 349, 791 P.2d at 393-94. Subsequently, the defendant moved to set aside the verdict or, alternatively, for a new trial based on newly discovered evidence and prosecutorial misconduct. Id. at 351, 791 P.2d at 394. The defendant presented testimony from his sister that prior to testifying at trial she had told the prosecutor that a week before her boyfriend's death, he had assaulted a neighbor whom she believed had been looking in her bedroom window. Id. at 353-54, 791 P.2d at 396. The sister testified that the prosecutor told her not to mention it so as to not make the

boyfriend look bad.  Id.  The circuit court denied the defendant's motion.  Id. at 351, 791 P.2d at 394.

On appeal, this court concluded that the prosecution had a duty to disclose its knowledge of the incident of violence under HRPP Rule 16, and the failure to make such a disclosure was a violation of that rule.  Id. at 355-56, 791 P.2d at 396-97.  Since the violation substantially prejudiced the defendant's self-defense argument and it was not discovered until after the completion of trial, we vacated the defendant's conviction and remanded the case for a new trial.  Id.

In this case, it appears the State became aware of the second confession letter during a May 5, 2017 interview of Kona by investigating officers.[22]  The State disclosed the existence of the letter and its nature to the defense on May 23, 2017, when it provided defendant with the transcript of Kona's interview.  Accordingly, Texeira was aware of the second confession letter once he received Kona's interview statements. The State then came in physical possession of the letter upon receiving it from Kona's counsel, and it appears the State promptly provided a copy of the letter to the defense upon receipt.

---

[22]    At minimum, the State was aware of the letter after the May 19, 2017 interview in which Kona's attorney discussed the contents of the letter with investigating officers.

Texeira contends, however, that the State had constructive possession of the letter and therefore an obligation to disclose it as soon as Kona began negotiating a plea deal with the prosecution.  The issue of whether the prosecution is in possession of documents that are in the possession of other individuals involved in the prosecution of a defendant was considered, under Federal Rules of Criminal Procedure Rule 16, in United States v. Smukler.[23]  No. 17-563-02, 2018 WL 3632148 (E.D. Pa. July 31, 2018).  The defendant in Smukler relied solely on the fact that the relevant witnesses were cooperating with the prosecution to support the conclusion that the witnesses, and thus the documents they possessed, were under the prosecution's control.  Id. at *3.  The Smukler court

---

[23]    Federal Rule of Criminal Procedure Rule 16 (2013) provides in relevant part as follows:

>     (a) Government's Disclosure.
>
>        (1) Information Subject to Disclosure.
>
>        . . . .
>
>        (B) Defendant's Written or Recorded Statement. Upon a
>        defendant's request, the government must disclose to
>        the defendant, and make available for inspection,
>        copying, or photographing, all of the following:
>
>            (i) any relevant written or recorded statement by
>            the defendant if:
>
>                • the statement is within the government's
>                possession, custody, or control; and
>
>                • the attorney for the government knows--or
>                through due diligence could know--that the
>                statement exists[.]

rejected this contention and found that the mere fact that a witness was cooperating with the government did not place the witness or any documents in the witness's possession under the government's control.[24]  Id. at *3-4.

Whether the prosecution has constructive possession of a document will depend on the factual circumstances of each case.  See United States v. Reyeros, 537 F.3d 270, 281-82 (3d Cir. 2008) (noting that a case-by-case analysis is appropriate when considering the prosecution's constructive knowledge of exculpatory evidence under Brady).  In United States v. Graham, for example, the Sixth Circuit considered the particular facts of the case and concluded that the prosecution's constitutional

_____

[24]  The court in Smukler determined that the analysis for whether documents in the possession of other government agencies or individuals involved in the prosecution of a defendant were in the possession of the prosecution under Brady v. Maryland, 373 U.S. 83 (1963), was applicable to the prosecution's possession of documents for purposes of Federal Rule of Criminal Procedure Rule 16.  No. 17-563-02, 2018 WL 3632148, at *3 (citing United States v. Graham, 484 F.3d 413, 417-18 (6th Cir. 2007)).

The Brady rule has been incorporated into the Hawaiʻi due process jurisprudence and applied by this court.  See, e.g., State v. Estrada, 69 Haw. 204, 215, 738 P.2d 812, 821 (1987).  Under this rule, "[t]he suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment, regardless of the good faith or bad faith of the prosecution."  State v. Fukusaku, 85 Hawaiʻi 462, 479, 946 P.2d 32, 49 (1997) (quoting State v. Matafeo, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990)).  There is no contention by Texeira that the letter provided favorable evidence to him.  We do not, however, restrict our interpretation of HRPP Rule 16 to the Brady standard.  In some cases, for example, due process will require the State to disclose evidence beyond the disclosures required by the rules of penal procedure.  See State v. Tetu, 139 Hawaiʻi 207, 214, 386 P.3d 844, 851 (2016) ("[T]he HRPP Rule 16 discovery right does not purport to set an outer limit on the court's power to ensure a defendant's constitutional rights." (citing United States v. Yoshimura, 831 F. Supp. 799, 805 (D. Haw. 1993)).

disclosure obligations did not extend to a cooperating witness who "remained an independent actor." United States v. Graham, 484 F.3d 413, 417-18 (6th Cir. 2007). The court noted that the prosecution had to obtain approval from the witness's counsel before interviewing the witness, the prosecution had to serve the witness with a subpoena to compel production of documents, and the witness refused to produce materials covered by the attorney-client privilege to the prosecution. Id. The State's possession of documents for purposes of HRPP Rule 16 will similarly depend on multiple factors and the specific facts of each case. Cf. Reyeros, 537 F.3d at 282 (noting that a relevant factor is whether the entity charged with constructive possession had "ready access" to the evidence).

In this case, the record does not demonstrate that the State exerted any control over Kona's actions in relation to other witnesses or matters related to the case, other than he was a cooperating witness. Texeira cites the fact that Kona had negotiated for and ultimately received a plea deal, but the mere fact that a witness is cooperating with the prosecution does not show that the witness or the documents in the witness's possession are under the prosecution's control for purposes of the prosecution's disclosure obligations under HRPP Rule 16. Therefore, we hold that Texeira has not shown that the State had possession of the second confession letter for purposes of HRPP

Rule 16, and the State was not obligated to obtain the letter from Kona's counsel before it received the letter.[25]

Accordingly, Texeira has not demonstrated that the timing of the State's disclosure of the confession letter was a violation of HRPP Rule 16, and therefore exclusion was not shown to be the appropriate remedy. Cf. Moriwaki, 71 Haw. at 356, 791 P.2d at 397 (concluding that a new trial was the proper remedy for an HRPP Rule 16 violation when it was the only remedy available to cure the prejudice defendant suffered).

### B. The Circuit Court Did Not Err by Permitting the Introduction of DNA Evidence Without a Showing that the DNA Tests Were Conducted in Accordance with Manufacturer Specifications.

The admissibility of scientific evidence under HRE Rules 702[26] and 703[27] is governed by five factors: whether (1) the

---

[25] Additionally, the record does not show that the timing of the State's disclosure of the letter was prejudicial such that it compelled Texeira to elect between waiving his right to a speedy trial and conducting fingerprint or handwriting analysis on the letter. During the State's motion to determine voluntariness, Texeira did not state that he had retained or made an effort to retain an expert to analyze the authenticity of the second confession letter, indicate the length of time needed to obtain an analysis by an expert, or make any showing that the analysis could not be completed before the trial date. Consequently, the record does not show that the timing of the State's disclosure of the letter impaired Texeira's ability to present his defense. See Tetu, 139 Hawai'i at 220, 386 P.3d at 857 ("Due process requires that a defendant be given a meaningful opportunity to present a complete defense and that discovery procedures provide the maximum possible amount of information and a level-playing field in the adversarial process.").

[26] HRE Rule 702 (2016) provides as follows:

Testimony by experts. If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

(continued . . .)

evidence will assist the trier of fact to understand the evidence or to determine a fact in issue; (2) the evidence will add to the common understanding of the jury; (3) the underlying theory is generally accepted as valid; (4) the procedures used are generally accepted as reliable if performed properly; and (5) the procedures were applied and conducted properly in the present instance.  State v. Montalbo, 73 Haw. 130, 140, 828 P.2d 1274, 1280-81 (1992).  This court has previously taken judicial notice of the fact that DNA evidence is not controversial and is "widely accepted in the relevant scientific community" and that the "basic techniques underlying the analysis" are also widely accepted.  Id. at 141, 828 P.2d at 1281.  DNA evidence has also

---

(. . . continued)

> witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.  In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

[27]  HRE Rule 703 (2016) provides as follows:

> Bases of opinion testimony by experts.  The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.  The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

been recognized as adding to the common knowledge of the jury and will assist the trier of fact to understand evidence.  Id.

Texeira argues that the State was required to show that the DNA analyses of the evidence in this case were conducted in accordance with the manufacturer's recommended procedures in order to establish a proper foundation for admission of the test results.  Accordingly, the pertinent inquiry in this case is Montalbo's fifth element: whether Sorenson's DNA analyses were "applied and conducted properly." 73 Haw. at 140, 828 P.2d at 1281.

When considering Montalbo's fifth element, we have held that a "foundational prerequisite for the reliability of a test result is a showing that the measuring instrument is in proper working order."  State v. Wallace, 80 Hawaiʻi 382, 407, 910 P.2d 695, 720 (1996) (internal quotation marks omitted). "Therefore, a proper foundation for the introduction of a scientific test result would necessarily include expert testimony regarding: (1) the qualifications of the expert; (2) whether the expert employed valid techniques to obtain the test result; and (3) whether the measuring instrument is in proper working order."  State v. Long, 98 Hawaiʻi 348, 355, 48 P.3d 595, 602 (2002) (internal quotation marks omitted) (holding that the State failed to establish a sufficient foundation that a laboratory instrument was in proper working order when it did

not ask any questions regarding the instrument's accuracy). This court has previously considered, in certain contexts, whether the State must show that a measuring device was used in accordance with the manufacturer's recommended procedures before allowing the measurement into evidence. Wallace, 80 Hawai'i at 412, 910 P.2d at 725 (calibration of electronic balance for measuring the weight of narcotics); State v. Manewa, 115 Hawai'i 343, 167 P.3d 336 (2007) (electronic balance and gas chromatograph mass spectrometers used to measure and identify controlled substances); State v. Assaye, 121 Hawai'i 204, 210-14, 216 P.3d 1227, 1233-37 (2009) (calibration of laser gun for measuring a vehicle's speed); State v. Fitzwater, 122 Hawai'i 354, 227 P.3d 520 (2010) (calibration of speedometers for speed check results).

In Wallace, we held that the State failed to lay a sufficient foundation as to the accuracy of an electronic balance that was used to weigh the amount of cocaine found in the defendant's car. 80 Hawai'i at 411-12, 910 P.2d at 724-25. We noted that the expert witness through which the State introduced the results of the electronic balance into evidence lacked personal knowledge as to whether the balance was properly calibrated at the time it was used to weigh the cocaine. Id. at 412, 910 P.2d at 725. The manufacturer's service representative, who conducted annual calibrations of the

43

balance, did not testify regarding maintenance of the device, and the State did not offer any "business record of the manufacturer reflecting proper calibration of the balance." Id. Accordingly, we held that the State had failed to establish that the balance measured weight accurately at the time it was used to measure the cocaine, and thus the admission of the expert's testimony regarding its weight was erroneous. Id.

In Manewa, we similarly held that the prosecution had laid an inadequate foundation for the introduction of an electronic balance's measurement of methamphetamine purchased from the defendant by an undercover officer. 115 Hawai'i at 355, 167 P.3d at 348 ("Moreover, as in Wallace, [the State] did not offer any business records of the manufacturer indicating a correct calibration of the balance."). Also at issue was the reliability of gas chromatograph mass spectrometers (GCMSs) that the State's expert witness used to identify the substance as methamphetamine. Id. at 350, 167 P.3d at 343. We concluded that the expert's testimony that the devices were operating within the manufacturer's specifications "supported the conclusion that the GCMSs were in proper working order at the time the evidence was tested." Id. at 354, 167 P.3d at 347 (citing Wallace, 80 Hawai'i at 407, 910 P.2d at 720). As such, the State had laid an adequate foundation as to the identity of

the methamphetamine, and the testimony was properly admitted.
Id.

We again considered the relevance of manufacturer-recommended procedures for the operation of a measuring device in Assaye. 121 Hawai'i at 210-14, 216 P.3d at 1233-37. The defendant in Assaye was convicted of excessive speeding after a bench trial at which the citing police officer testified that he used a laser gun to determine that the defendant was speeding. Id. at 205, 216 P.3d at 1228. The officer testified that he was certified to use the laser gun through a one hour class taught by another police officer and he performed four tests to ensure the accuracy of the laser gun before using it. Id. at 212, 216 P.3d at 1235. There was no expert testimony that the tests the officer performed were reliable, and the State did not show that the laser gun's manufacturer recommended using these tests to ensure the reliability of the laser gun's measurements. Id. The defendant objected that there was an insufficient foundation for the officer's testimony, but the circuit court overruled the objection. Id. at 207-09, 216 P.3d at 1230-32.

On appeal, we held that there was an inadequate foundation to show the laser gun's measurements were reliable. Id. at 214, 216 P.3d at 1237. Additionally, we noted that with regard to our conclusion that the GCMSs in Manewa were reliable, it was "[c]rucial" that the record indicated the device

45

manufacturer had established parameters to ensure the machine was in working order, and the expert testimony indicated that the devices were operating within those parameters. Id. at 212-13, 216 P.3d at 1235-36. In contrast, the Assaye court stated that the record in that case was silent as to what procedures the laser gun's manufacturer recommended, and there was no expert testimony that the procedures the officer had used were reliable. Id. at 213, 216 P.3d at 1236. After observing that courts in other jurisdictions had considered evidence as to the manufacturer-recommended procedures to maintain a laser gun and ensure its accuracy, we concluded that the State had not laid an adequate foundation to show that the laser gun's measurement was reliable because the State had not adduced any evidence as to the procedures the manufacturer recommended to ensure the device's accuracy. Id. at 213-14, 213 n.7, 216 P.3d at 1236-37, 1236 n.7; accord State v. Apollonio, 130 Hawai'i 353, 359-62, 311 P.3d 676, 682-85 (2013); see also Fitzwater, 122 Hawai'i at 375, 227 P.3d at 541 (noting that because the record did not indicate what kind of test was performed to ensure the speedometer in the officer's vehicle was reliable, the foundational requirements set forth with respect to the electronic balance in Wallace and Manewa were applicable).

Texeira contends that these prior holdings required the State to demonstrate that the analyses conducted in this

46

case were done in accordance with the manufacturer's established recommendations. First, this is not a case where the expert witness lacked personal knowledge as to whether the device was properly calibrated at the time it was used, as was the situation with the electronic balances discussed in Wallace and Manewa. Furthermore, our holding in Manewa with respect to the GCMSs does not require that the State prove calibration in compliance with the manner recommended by the manufacturer. 115 Hawai'i at 354, 167 P.3d at 347. The Manewa court held that the expert's testimony established that the devices were in working order according to the manufacturer's specifications, and accordingly an adequate foundation was laid. Id. Nor is this case similar to Assaye, where the only evidence as to the reliability of the laser gun's measurement was the officer's lay testimony. 121 Hawai'i at 214, 216 P.3d at 1237. Here, the State sought to demonstrate the reliability of the instruments used to conduct the DNA analyses by presenting expert testimony as to the operating procedures employed by Sorenson, the training requirements for its employees, its accreditation process, and by introducing a business record to prove the devices were in working order at the time they were used.

As stated, the test for determining whether a party has laid a sufficient foundation for the admissibility of an expert's testimony as to scientific test results is that

47

established in Long.  98 Hawaiʻi at 355, 48 P.3d at 602.  The proponent of the evidence must present expert testimony as to the qualifications of the expert, whether the expert employed valid techniques to obtain the test result, and whether the measuring instrument was in proper working order at the time it was used.  Id.

In this case, Jeskie testified that all of the instruments used to analyze the samples in this case were validated.  She explained that validation is a process used to ensure that the data produced by the device is reliable and reproducible.  Jeskie further testified that the validation process used by Sorenson was consistent with the validation process required by the FBI's quality assurance standards. Sorenson's compliance with the FBI's quality assurance standards is necessary for its accreditation by ASCLD, and Sorenson's laboratory and equipment were subject to regular audits by ASCLD in order for Sorenson's accreditation to be maintained. Additionally, Jeskie testified that all the Sorenson laboratory employees are required to complete a training program on the proper use of the laboratory equipment, and that the program is reviewed as part of the ASCLD accreditation process.  Jeskie indicated that Sorenson had never lost its ASCLD accreditation or had its accreditation withheld or suspended.  Jeskie also explained that each machine used in this case was subject to a

control, which would have revealed whether there was a mistake or error in the test. Finally, the State presented a certified business record at the pretrial HRE Rule 104 hearing to prove the machines were properly maintained at the time of testing by showing that they underwent daily, weekly, monthly, and annual maintenance, and they were properly calibrated to ensure the test results were accurate.

Based on the foregoing, we conclude the State has proven by a preponderance of the evidence that the machines used to analyze the DNA evidence in this case were in proper working order at the time they were used, and thus the State laid a sufficient factual foundation for Jeskie's testimony as to the results of those analyses. Long, 98 Hawai'i at 355, 48 P.3d at 602; State v. Gano, 92 Hawai'i 161, 172, 988 P.2d 1153, 1164 (1999) (noting that when the facts necessary for admissibility are contested, the proponent of the evidence must show it is admissible by a preponderance of the evidence); accord State v. Martin, No. SCWC-14-0001090, 2020 WL 1934475, at *14 (Haw. April 22, 2020) (noting that this court "adopted the preponderance of the evidence standard for foundation factfinding in HRE Rule 104(a) admissibility hearings") (alterations omitted) (quoting State v. McGriff, 76 Hawai'i 148, 871 P.2d 782 (1994)).

A review of decisions from other jurisdictions that have addressed the admissibility of DNA test results from

laboratories that operate under ASCLD and FBI standards lends support to the reliability of the standards used in this case. For example, in State v. Powell, the Tennessee Court of Criminal Appeals concluded that an expert was properly allowed to testify regarding the laboratory's DNA analysis because the laboratory had "complied with the rigorous protocols necessary to obtain and maintain ASCLD accreditation."[28]  Powell, No. W2013-00844-CCA-R3-CD, 2014 WL 1329233 (Tenn. Crim. App. April 3, 2014). Similarly, Nebraska courts have found that the Daubert framework was satisfied by a DNA expert's testimony that the laboratory in question was (1) accredited by ASCLD, (2) complied with the FBI's testing requirements, and (3) the expert was "required to pass a proficiency examination twice a year."  State v. Warner, No. A-15-858, 2016 WL 4443559, at *5 (Neb. App. Aug. 23, 2016); see also State v. Tolliver, 689 N.W.2d 567, 576 (Neb. 2004); State v. Fernando-Granados, 682 N.W.2d 266, 281-82 (Neb. 2004). The Ohio Court of Appeals addressed the issue in State v. Bruce, concluding that an expert was qualified to testify regarding a

---

[28]    In United States v. Morgan, the court detailed the extensive process a laboratory must engage in to receive ASCLD accreditation.  53 F.Supp.3d 732, 738-39 (S.D. N.Y. 2014).  The court noted that a laboratory is required to submit an application to ASCLD, who conducts an on-site assessment that entails interviewing all relevant employees, observing the employees perform their job functions, reviewing records accompanying the application, and analyzing case records to determine whether the laboratory's results are accurate and appropriate.  Id. at 738.  ASCLD then issues a report detailing whether the laboratory has met accreditation requirements; if accreditation is granted, the laboratory is required to provide records demonstrating conformity with accreditation requirements and submit an annual report detailing compliance.  Id. at 739.

DNA analysis after noting that the laboratory in that case was ASCLD accredited and that the expert passed FBI proficiency tests.  Bruce, No. 2006-CA-45, 2008 WL 4801648, at *12 (Ohio App. Oct. 31, 2008).  A New Mexico district court similarly found that a machine's DNA test results were admissible because the laboratory was ASCLD accredited, followed FBI Quality Assurance Standards, and established "rigorous standards for technical procedures and policies, undergoing proficiency testing, internal validation, and performance checks."  United States v. McCluskey, 954 F.Supp.2d 1224, 1256 (D. N.M. 2013).

In addition to caselaw, California and Indiana have passed statutes mandating that DNA laboratories either use quality assurance standards approved by ASCLD or meet FBI Quality Assurance Standards.  See Cal. Penal Code § 297(a)(1) (2007) (requiring DNA laboratories to meet the FBI Quality Assurance Standards); Ind. Code Ann. § 10-13-6-14 (2003) (requiring a "laboratory conducting forensic DNA analysis" to "implement and follow nationally recognized standards for DNA quality assurance and proficiency testing, such as those approved by the American Society of Crime Laboratory Directors Laboratory Accreditation Board").[29]  In sum, several

---

[29]     Texeira argues that State v. Tankersley stands for the proposition that a laboratory must comply with a manufacturer's specification in order for its tests to be admissible.  However, the Tankersley court held

(continued . . .)

jurisdictions consider ASCLD accreditation as foundational evidence that DNA tests conducted in the accredited laboratory are reliable.[30]

Here, as discussed above, the record establishes by a preponderance of the evidence that the machines Sorenson used to conduct the DNA analysis in this case were reliable.  The State laid a proper foundation to the introduction of this evidence by proving that Jeskie was properly qualified, the techniques Sorenson used were valid, and the machines were in proper working order at the time they were used.  Long, 98 Hawaiʻi at 355, 48 P.3d at 602 (2002).  Accordingly, the circuit court did

_____

(. . . continued)

that the "appropriate inquiry is whether a lab's techniques have deviated so far from generally accepted practices that the tests results cannot be accepted as reliable." 956 P.2d 486, 493 (Ariz. 1998), abrogated on other grounds by State v. Machado, 246 P.3d 632 (Ariz. 2011).  The Tankersley court specifically noted that ASCLD accreditation can "provide a useful gauge of reliability, but it is not required" as a "prerequisite for admitting any lab's test results." Id. (citation omitted).  The court then noted that the trial court did not abuse its discretion by qualifying expert witnesses and admitting laboratory test results at issue where they complied sufficiently with "the protocols of [the laboratory in question], other labs, and the kit's manufacturer." Id.  Thus, Tankersley does not appear to require compliance with a manufacturer's protocols as a prerequisite to admission of the test results.

[30]  We note, however, that the ASCLD/LAB accreditation process has been subject to criticism, namely that (1) "inspectors can be employed by crime labs that are themselves reviewed by ASCLD/LAB," (2) the "ASCLD/LAB relies on annual self-audits" between inspections, (3) "ASCLD/LAB procedures permit each analyst to select five cases for review during an audit" and (4) ASCLD/LAB "require[s] inspectors to destroy their notes of inspections." Paul C. Giannelli, Regulating DNA Laboratories: The New Gold Standard?, 69 N.Y.U. Ann. Surv. Am. L. 617, 636-37 (2014).

not err in permitting Jeskie to testify as to the results of the DNA tests.

## C.    Evidence of Flores' Culpability Was Improperly Excluded by the Trial Court but the Exclusion Was Harmless Beyond a Reasonable Doubt.

### 1. Portions of Texeira's Third-Party Culpability Evidence Were Admissible Under HRE Rules 401 and 403.

Texeira asserts that the circuit court erred by precluding him from adducing third-party culpability evidence showing that Flores killed Togioka.  The circuit court determined that the evidence should be excluded because Texeira had not proven there was a "legitimate tendency" that Flores could have committed the crime, as required by our holding in State v. Rabellizsa.  79 Hawai'i 347, 903 P.2d 43 (1995).  This court recently determined in State v. Kato, No. SCWC-15-0000329 (Haw. June 18, 2020), that the admissibility of third-party culpability evidence is governed by the HRE Rule 401 relevancy standard and the limitations provided by HRE Rule 403 and is not subject to a legitimate tendency test.[31]

---

[31]    Justice Nakayama's concurring and dissenting opinion (dissent) states that "motive alone is collateral and irrelevant," citing several cases for this proposition.  Dissent at 9-10.  This was not our decision in Kato nor is it our decision today.  As we explained in Kato,

> The dissent misapprehends the holding of this opinion, contending that our decision would allow "third-party motive evidence alone" to establish relevancy.  Instead, our opinion applies HRE Rule 401's relevancy standard to proffered third-party culpability evidence in the same manner as that rule applies to all other evidence.  It
>                                          (continued . . .)

53

Texeira argues that Flores either killed Togioka herself or ordered another person to kill him.[32] Texeira contends the following evidence that Flores killed Togioka was relevant and admissible: (1) Flores, while on the phone with Kona two days before Togioka's death, made a comment about wanting to shoot Togioka; (2) Flores was upset at Togioka, after learning the day before his death, that he had previously claimed to be in a sexual relationship with her; (3) Flores was in possession of a .22-caliber rifle that could have been used to kill Togioka before his death; (4) Flores was arrested two days after the killing with .22-caliber bullets; (5) Flores went

_____

(. . . continued)

> rejects the higher burden adopted in Rabellizsa, which is not consistent with the Hawai'i Rules of Evidence. . . . As stated, we do not hold that evidence of a third party's motive on its own will ipso facto allow admissibility of such evidence, instead HRE Rule 401 and Rule 403 govern.

No. SCWC-15-0000329, at 40 n.29 (citations omitted).

[32] At trial, defense counsel argued that Kona, Pagala, or Flores killed Togioka. On appeal, Texeira only challenges the circuit court's refusal to admit evidence tending to show Flores killed Togioka. Texeira was not precluded from introducing evidence that Kona killed Togioka, so we do not consider whether evidence of his culpability should have been admitted. Additionally, defense counsel expressly stated at trial that he was not claiming that Pagala killed Togioka, and he thus did not preserve this contention. Even under a plain error review, Texeira does not identify on appeal evidence he would have used to show Pagala killed Togioka. As part of the proffer of Flores' culpability, Texeira stated that Flores gave Pagala .22-caliber bullets, Pagala was arrested the day after the murder with Flores and in possession of a .22-caliber rifle and bullets, and Pagala came to Kona's house the night of the murder with Flores. As this evidence was actually proffered as evidence of Flores' culpability, the determination of whether the evidence should have been admitted ultimately depends on the resolution of the admissibility of the third-party culpability evidence regarding Flores, and this evidence is thus considered in that light.

to Kona's home the night after Togioka's death and was "paranoid" and "did not seem herself"; (6) Flores' lawyer stated that the evidence implicated her in Togioka's killing; (7) Flores had previously tortured a person who owed her money; and (8) Flores gave a false alibi to the police and her whereabouts were not verified.[33] We first consider the relevance of each proffered piece of evidence.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401 (2016). The evidence that Flores told Kona she wanted to shoot Togioka a few days before he died is probative of her motive to kill Togioka and is therefore relevant to a fact of consequence to the determination of the action: that Flores was responsible for killing Togioka, making it less probable that Texeira committed the offense of which he was charged. See Tibbs v. State, 59 N.E.3d 1005, 1011 (Ind. Ct. App. 2016) ("Evidence which tends to show that someone else committed the crime makes it less probable that the defendant committed the

---

[33] The KPD reviewed surveillance footage from a McDonald's in Ele'ele to corroborate a statement Flores made during her November 2 interview regarding her whereabouts on the night that Togioka was killed, and the police report noted that she was not shown in the footage. However, Flores had told the interviewing officers that she was at the McDonald's on the night of either October 29 or 30, 2016, and it appears KPD mistakenly reviewed the footage from October 31.

crime and is therefore relevant under [Evidence] Rule 401.") (alteration in original); see also State v. Pepin, 940 A.2d 221 (N.H. 2007) (upholding trial court's finding that defendant's prior threat was relevant to show his intent when directed at the same victim). Similarly, the evidence that Flores was angry with Togioka at that time and had confronted him because she had recently learned that he had claimed to be in a sexual relationship with her would tend to make it more probable that Flores had a motive to kill Togioka. Thus, it is relevant evidence under HRE Rule 401.

Texeira also argued that Flores had access to a gun that was potentially the murder weapon and was arrested with .22-caliber bullets that could have been used to kill Togioka two days after Togioka's death. Generally, the mere fact that an allegedly culpable third-party possessed a weapon of the same caliber as the one used in the crime has minimal probative value, but this value is significantly enhanced if the surrounding circumstances permit the jury to infer that the gun was in fact used in the crime. See, e.g., People v. Brown, 697 N.Y.S.2d 892 (N.Y. App. Div. 1999) (defendant's possession of a silver .380-caliber handgun four days before the charged crime was properly admitted in view of evidence that one of the participants in the crime carried a silver .380-caliber handgun); People v. Sheriff, 652 N.Y.S.2d 916, 917 (N.Y. App.

Div. 1996) (holding that defendant's possession of a distinctive chrome-plated handgun subsequent to alleged murder was admissible). Here, although the .22-caliber rifle and ammunition in Flores' possession were not distinctive, the fact that evidence indicated Flores was in possession of the weapon the day before Togioka's death, coupled with the other proffered evidence, has "a tendency, either directly or circumstantially," to show that Flores may have been the person who killed Togioka, and thus the evidence is relevant under HRE Rule 401.[34] Kato, No. SCWC-15-0000329, at 41.

The evidence that Flores was acting "paranoid" and "did not seem herself" shortly after Togioka's death also has a tendency to show the existence of a fact of consequence--that Flores killed Togioka--and thus is relevant under HRE Rule 401. See Brunson v. State, 245 S.W.3d 132, 141 (Ark. 2006) (evidence showing defendant's strange behavior towards victim was relevant to his murder conviction); Horton v. State, 217 So.3d 27, 57-58 (Ala. Crim. App. 2016) (stating that evidence of strange

---

[34] Although Texeira's argument that Flores gave a false alibi was not substantiated by the KPD, Texeira correctly notes that her whereabouts on the night of Togioka's death were unverified. The only evidence of Flores' whereabouts on that evening is Flores' statement to the police in which she repeatedly stated she could not recall where she was or what she was doing on the evening of October 31, 2016. After repeatedly denying any recollection, Flores finally stated that she was at her home alone with Pagala that evening after the officers told her that the evidence implicated her in Togioka's death.

behavior before and after the murder was relevant, but concluding the specific evidence at issue was properly excluded as it was collateral); Harris v. State, No. 14-16-00282-CR, 2018 WL 1004879, at *3 (Tex. Ct. App. 2018) (finding that appellant's strange behavior before a murder contributed to the sufficiency of the evidence in his conviction).[35]

Texeira also appears to argue on appeal that he should have been able to introduce into evidence a declaration that Flores' counsel attached to the notice of intent to claim the privilege against self-incrimination, which Flores filed after the State revoked her immunity. However, a personal opinion by Flores' counsel as to whether or not the evidence implicated Flores does not tend to make it more or less likely that Flores killed Togioka or was responsible for his death. Accordingly, Flores' counsel's statement is not relevant.

---

[35] The dissent asserts that Flores' paranoid behavior is not probative of a guilty mind because Flores was acquainted with Togioka and speculates that her paranoid behavior was merely an expression of grief. Dissent at 16 n.11. The dissent's speculative explanation for Flores' conduct is unsupported by any evidence and, more importantly, the fact that evidence is consistent with more than one narrative does not mean that it is irrelevant. To be relevant, evidence need only have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. HRE Rule 401. The evidence does not need to conclusively demonstrate the existence of a fact to the exclusion of all other possible explanations, as the dissent essentially asserts. The dissent also appears to argue that evidence of Flores' guilty mind is measured differently because she was a third party. Dissent at 16 n.11. As explained, however, evidence of a third party's culpability is not a special species of evidence and is governed like other evidence by the Hawai'i Rules of Evidence. Kato, No. SCWC-15-0000329, at 34.

Finally, Texeira maintains the evidence that Flores had previously tortured a person who owed her money is relevant to show that Flores had a motive to kill Togioka or intimidated other witnesses into testifying falsely. Breen, who allegedly saw a video of Flores torturing someone, would have testified that in the video Flores used an electroshock weapon to torture a debtor. Standing alone, this testimony is not relevant. Because of the absence of evidence connecting Breen's statements about the video to the other witnesses at trial, this evidence is not relevant to whether Flores intimidated any of the witnesses into testifying falsely.

The dissent maintains that "third-party culpability evidence is a different species than evidence of the defendant's own guilt." Dissent at 8; see also dissent at 12-13. We rejected this categorization of evidence in Kato, noting that the Hawai'i Rules of Evidence "govern proceedings in the courts of the State of Hawaii." No. SCWC-15-0000329, at 33 (quoting HRE Rule 101 (2016)). We further explained that "the basic precondition for admissibility of all evidence is that it is relevant as that term is defined in HRE Rule 401." Id. (quoting Medeiros v. Choy, 142 Hawai'i 233, 245, 418 P.3d 574, 586 (2018); People v. Hall, 718 P.2d 99, 104 (Cal. 1986) ("[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible (§ 350) unless its

probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion (§ 352)." (emphasis added)); see also People v. Young, 445 P.3d 591, 614-15 (Cal. 2019) ("In other words, courts treat third party culpability evidence 'like any other evidence: if relevant it is admissible, . . . unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion.'" (quoting People v. Lewis, 28 P.3d 34 (Cal. 2001))).

As stated, we reconsidered the appropriateness of the legitimate tendency test in Kato and held that the admissibility of third-party culpability evidence is governed by HRE Rule 401 and HRE Rule 403. No. SCWC-15-0000329, at 34-40. Under HRE Rule 401, the standard is whether the evidence has any tendency, "either directly or circumstantially," to show the third person was responsible for the charged offense.[36] Id. at 37.

Evidence that is relevant under HRE Rule 401 may still be excluded under HRE Rule 403 if its probative value is

---

[36] The dissent relies upon State v. R.Y., No. 081706, 2020 WL 2182230 (N.J. May 6, 2020), dissent at 14, which held that, for third-party culpability evidence to be relevant, "[s]omewhere in the total circumstances there must be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case." R.Y., No. 081706, 2020 WL 2182230, at *9 (alteration in original) (emphasis added) (holding that the trial court erred in excluding third-party culpability evidence because the proffered evidence was not "mere conjecture" and pertained to an essential feature of the State's case). Rather than importing a standard from another jurisdiction for one species of evidence, we apply the relevancy standard set forth in the Hawaiʻi Rules of Evidence to ensure consistent application of our rules to all categories of evidence, as indeed HRE Rule 101 requires. Medeiros, 142 Hawaiʻi at 245, 418 P.3d at 586.

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[37]  HRE Rule 403; Medeiros, 142 Hawai'i at 248, 418 P.3d at 589.  When weighing probative value versus prejudicial effect in this context, a court must consider a variety of factors, including "the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility."  State v. Renon, 73 Haw. 23, 38, 828 P.2d 1266, 1273 (1992).  As stated in Kato, a trial court should resolve a close question of admissibility in favor of the defendant.  No. SCWC-15-0000329, at 36 (citing Winfield v. United States, 676 A.2d 1, 6-7 (D.C. 1996)).

Evidence that Flores told Kona she'd like to shoot Togioka a few days before his death is highly probative because it demonstrates Flores' desire to have Togioka killed.[38]  State

---

[37]    HRE Rule 403 (2016) provides as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[38]    The dissent criticizes our consideration of Kona's statement that Flores said something to him about wanting to shoot Togioka during a telephone conversation two days before the killing because, according to the dissent, Texeira did not draw "the circuit court's attention" to Kona's statement in his trial memorandum.  Dissent at 11 n.7.  Contrary to the dissent's assertion, Texeira attached Kona's statement to the police as an exhibit to his trial memorandum, cited the precise page on which Kona related

(continued . . .)

v. Cordeiro, 99 Hawai'i 390, 417, 56 P.3d 692, 719 (2002) (threats to shoot victim were highly probative where murder weapon wasn't recovered). The evidence that Flores was upset at Togioka for claiming to be in a sexual relationship with her is also probative of Flores' motive. See Renon, 73 Haw. at 39, 828 P.2d at 1274 ("[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect[.]" (alterations in original)). The probative value of the proffered evidence is increased by the fact that Flores learned of Togioka's claim and made a threatening type of statement only two days before Togioka's death. Martin, No. SCWC-14-0001090, 2020 WL 1934475, at *18 (Haw. April 22, 2020) (noting that the challenged statement was made only an hour before the charged crime occurred). Conversely, the State would not be prejudiced by this evidence because there is minimal concern that it would constitute a waste of time or confuse the jury. Thus, the probative value of this evidence is not substantially outweighed by its prejudicial effect, and its exclusion was not supported by HRE Rule 403.

---

(. . . continued)

Flores' comment, and sought the admission of Kona's statement into evidence. Accordingly, the statement was presented to the circuit court for its consideration, and the dissent's contention is unavailing.

As noted, Flores' possession of a .22-caliber rifle and bullets is only mildly probative in and of itself. However, when considered in light of the other evidence, namely that Togioka was killed by a .22-caliber firearm, the fact that the murder weapon is contested, and that there is evidence Flores possessed the weapon the day of Togioka's death and was still in possession of .22-caliber ammunition two days later, the probative value of Texeira's proffered evidence is heightened and is not substantially outweighed by its prejudicial effect.[39]

Evidence that Flores was acting "paranoid" and "not herself" the night after Togioka was killed arguably may be probative as evidence of a guilty state of mind. The timing of when the observation of Flores was made and that it was observed in Kona's home--where the gun was taken from and returned--lends probative value to the evidence and it posed little risk of wasting time or confusing the jury. Thus, the admission of this evidence would not be substantially more prejudicial than probative.

---

[39] The probative value of this evidence is further enhanced by the fact that Flores was unable to recall her whereabouts on the night Togioka was killed and the only alibi she offered, after multiple denials of any recollection of her whereabouts, was that she was alone at home with Pagala. Kato, No. SCWC-15-0000329, at 35-36 ("A defendant need not place the third party at or near the scene of the crime; it is sufficient for relevancy considerations that the defendant has provided direct or circumstantial evidence tending to show that the third person committed the crime.").

Finally, although we have already concluded that the evidence that Flores tortured a debtor with an electroshock weapon is irrelevant, we note that even assuming marginal relevance of this evidence, its probative value is exceedingly low because it is unclear when the alleged incident occurred, the debtor was not Togioka, the motive to harm may have been different, and the weapon used is not the same type of weapon used in this case. Admitting this evidence would also require consideration of ancillary evidence, such as circumstances relating to the reliability and the contents of the video, which would involve confusion of the issues. The probative value is thus substantially outweighed by the factors set forth in HRE Rule 403.

Accordingly, the circuit court erred in excluding the evidence that Flores (1) told Kona she would like to shoot Togioka two days before his death; (2) was angry and upset at Togioka shortly before his death because she found out that he had claimed previously to be in a sexual relationship with her; (3) was in possession of a .22-caliber rifle the day of Togioka's death, (4) was arrested two days after Togioka's death with .22-caliber bullets; and (5) went to Kona's home the following evening after Togioka's death and was "paranoid" and "did not seem herself." See Medeiros, 142 Hawai'i at 248, 418 P.3d at 589.

## 2. The Exclusion of Texeira's Third-Party Culpability Evidence Was Harmless Beyond a Reasonable Doubt.

"In applying the harmless beyond a reasonable doubt standard, the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Souza, 142 Hawaiʻi 390, 402, 420 P.3d 321, 333 (2018) (brackets omitted) (quoting State v. Mundon, 121 Hawaiʻi 339, 368, 219 P.3d 1126, 1155 (2009)).

This is a case where there appears to be a "wealth of overwhelming and compelling evidence tending to show the defendant guilty beyond a reasonable doubt." State v. Rivera, 62 Haw. 120, 127, 612 P.2d 526, 532 (1980). Dela Cruz testified that he and Texeira picked up Togioka, they drove together to Kona's house, and Togioka and Texeira went into the home. Kona testified that Texeira asked him if he knew where Texeira's gun was at that time, and he told Texeira where to find it. Schmidt testified that Texeira retrieved the gun from the shelf behind the house and then Texeira, Dela Cruz, and Togioka left Kona's house together in a car. Dela Cruz testified that after they parked near Burns Field, Texeira and Togioka left the car and walked a short distance away. Dela Cruz then heard gunshots and heard Togioka yell, "you shot me." He saw Togioka face down on the ground, only 15-20 feet in front of the vehicle. Dela Cruz

stated that he saw Texeira return to the car with a .22-caliber revolver, then he and Texeira drove away, and Texeira told Dela Cruz that he shot Togioka.

Kona and Pagala testified that Texeira confessed to killing Togioka. Kona testified that Texeira told him in prison that he shot Togioka in the arm and the head, accurately identifying where the bullet wounds on Togioka were found. Pagala similarly testified that Texeira said he shot Togioka in the head and arm.

The State introduced a confession letter, as well as evidence that indicated that Texeira was its author. The confession letter stated that Texeira had wrestled his gun away from Togioka and then shot Togioka twice.[40] Texeira's cell phone was shown to be in the area where Togioka was killed at the time of his death. Texeira also acknowledged being in the general area at that time during his November 4, 2016 interview with Lt. Jenkins. Texeira sent a text message stating "All pau" to Kona about the time that the evidence indicated Togioka's death occurred. Most significantly, DNA evidence on a cigarette recovered next to Togioka's right calf matched Texeira's DNA

---

[40] Although the writer of the letter stated that the killing of Togioka was an act committed in self-defense, this defense was not raised or argued at trial; instead Texeira contended the killing was committed by Kona, Pagala, or Flores.

profile with the odds that the DNA belonged to a different individual being in the octillions.

On this record, there is no reasonable possibility that the exclusion of the third-party culpability evidence contributed to Texeira's conviction. Accordingly, the circuit court's error in excluding the third-party culpability evidence was harmless beyond a reasonable doubt.

## IV. CONCLUSION

For the foregoing reasons, the circuit court's Judgment and Sentence of Conviction is affirmed.

| | |
|---|---|
| Craig A. De Costa | /s/ Sabrina S. McKenna |
| Daniel G. Hempey | |
| for appellant | /s/ Richard W. Pollack |
| | |
| Tracy Murakami | /s/ Michael D. Wilson |
| for appellee | |

